UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHARLES ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:24-cv-00581-JPH-MG |
| | ) | |
| SAMUEL BYRD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Charles Alexander, who is incarcerated at Wabash Valley Correctional Facility, alleges that the defendants were deliberately indifferent to his injury and associated pain after he injured his knee playing soccer. The defendants have moved for summary judgment. For the reasons below, that motion is **GRANTED**.

## I.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to

consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Motion for Sanctions and Motion to Stay

Mr. Alexander has filed a motion for sanctions, arguing that NP Campbell, Dr. Byrd, and their former attorneys falsified his medical records. He has also filed a motion to stay a summary judgment ruling until an independent doctor can be appointed and the falsification issue is resolved. Dkt. 100.

Mr. Alexander alleges that NP Campbell falsified his records from an ultrasound of his knee by noting that the ultrasound indicated that he suffered a "sprain without tear." Dkt. 94 at 5; *see* dkt. 68-1 at 35, 36, 53. Mr. Alexander points out that the ultrasound results "suggest[ed] sprain without *full-thickness* tear." *Id.* at 18 (emphasis added). Mr. Alexander alleges that NP Campbell

falsified his records when she later wrote that his ultrasound showed a "sprain without tear," as opposed to a "sprain without full-thickness tear." Dkt. 94 at 5. Mr. Alexander then alleges that Dr. Byrd's responsibilities regarding his care were broader than Dr. Byrd argues and that Dr. Byrd incorrectly testified that his ligament was "intact." Dkt. 94 at 6–8.

Mr. Alexander references the sanctions issued in *Littler v. Martinez, et al.*, 2:16-cv-472-JMS-DLP, in which the defendant nurse was found to have knowingly presented false testimony to the Court. He does not present evidence, however, that his medical records were altered after they were created. *See Secrease v. W. & S. Life Ins. Co.,* 800 F.3d 397, 402 (7th Cir. 2015) (A Court can award sanctions for willingly abusing the judicial process or knowingly presenting false testimony or evidence.). Rather, his contention is that NP Campbell and Dr. Byrd made careless or intentional mistakes during his treatment. These arguments may be raised and considered in support of his deliberate indifference claim, but do not show that NP Campbell, Dr. Byrd, or their former counsel willingly abused the judicial process by presenting false evidence, warranting sanctions. Mr. Alexander's request for sanctions is denied.

Mr. Alexander's motion for an independent doctor and to stay a summary judgment ruling is also denied. Dkt. 100. Mr. Alexander contends that an independent doctor is necessary to determine whether the notation that his knee had a sprain "without tear" rather than "without full-thickness tear" affected the treatment he should have received. *Id.* at 5. The time to request an independent expert to evaluate Mr. Alexander's condition or medical records would have been

during the discovery phase of this case, not when the motion for summary judgment had already been fully briefed. Mr. Alexander has been able to thoroughly address these statements in the medical records. *See id.*

## III.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

Mr. Alexander heard a pop when he injured his knee playing soccer on June 30, 2024. Dkt. 68-1 at 3-5. A nurse, who is not a defendant, gave him over-the-counter pain medication and notified the medical provider, issued an Ace wrap and crutches, and obtained an order for a medical lay-in for seven days and an x-ray. *Id.* Mr. Alexander had an x-ray on July 4 and the results were normal. *Id.* at 7. He submitted a Health Care Request Form ("HCRF") that day stating that his knee was swelling badly and hurt constantly. *Id.* at 9.

Mr. Alexander saw defendant Nurse Mikayla Willis on July 7. *Id.* at 10. She reviewed with Mr. Alexander the results of the x-rays, advised him to rest and to wear the Ace wrap correctly to secure his knee[1], and referred him to the nurse practitioner. *Id.* He saw defendant Nurse Practitioner Casey Jacobs-Campbell on July 10.[2] *Id.* at 11-13. She noted that he reported a decrease in

[1] Mr. Alexander contends the Ace wrap did not immobilize his knee, but he does not designate evidence in support. Dkt. 80 at 3.

[2] Mr. Alexander denies seeing NP Campbell that day and claims this record was fabricated. He also claims that the visit notes from August 19, 2024, were fabricated.

swelling and was experiencing tingling down to his toes when pressure was applied to his knee. *Id.* NP Campbell further noted a "knot in the muscle" above Mr. Alexander's right knee, though he could fully extend his leg. *Id.* She advised him to continue treating his knee with the RICE method (rest, ice, compression, elevation) and using crutches. *Id.* at 12. She also ordered ibuprofen, a two-month extension of his medical lay-in, and an ultrasound to further assess his knee. *Id.* at 12-15.

Mr. Alexander submitted an HCRF on July 16 stating that his knee hurt "extremely bad." *Id.* at 17. Nurse Willis responded that Mr. Alexander had been scheduled for a provider visit. *Id.* Mr. Alexander had an ultrasound on July 20. *Id.* at 18. The results showed (1) thickened lateral collateral ligament (LCL) complex suggesting sprain without full-thickness tear, and (2) post-traumatic moderate joint effusion. *Id.* The radiologist stated that an MRI could "better demonstrate this anatomy." *Id.* On July 30, NP Campbell reviewed the results

---

But Mr. Alexander does not designate admissible evidence to dispute the defendants' evidence that NP Campbell saw Mr. Alexander on these days. While his surreply addresses this issue and is sworn, dkts. 103 and 103-2, that evidence is not admissible because it should have been provided in his response to the summary judgment motion. *See* dkt. 69 at 2–4 ¶¶ 8-10; 17-18 (designating as uncontested material facts treatment provided by NP Campbell during Mr. Alexander's appointments on July 10, 2024, and August 19, 2024); S.D. Ind. Local Rule 56.1(b);(e) (discussing non-movant's obligation to designate evidence in response to motion for summary judgment). Mr. Alexander also points out that the date on the bottom of these records indicate they were generated on January 6, 2025, but he has not designated evidence to contest NP Campbell's affidavit that the visit notes were entered on January 6, 2025 based on her paper notes from these visits. Dkt. 96-2 ¶ 4-5. She also designates evidence that the prison's count letters show that Mr. Alexander was transported to medical on those days. Dkt. 96-3. Moreover, Mr. Alexander does not otherwise dispute the treatment NP Campbell provided, including submitting an OPR and providing a lay-in and bottom bunk pass, leaving it undisputed that NP Campbell treated Mr. Alexander's condition. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (explaining that the Court looks "at the totality" of "medical care when considering whether that care evidences deliberate indifference").

and noted that Mr. Alexander should continue using the RICE method and that he had been scheduled for a visit. *Id.* Mr. Alexander submitted another HCRF on July 31 stating that he was out of pain medication and that his knee hurt extremely bad. *Id.* at 19. He submitted another HCRF on August 12, again asking for a refill of his medication. *Id.* at 20.

Mr. Alexander saw NP Campbell on August 19 and noted that he had been using crutches and the RICE protocol with minimal improvement. *Id.* at 22-24. She ordered an extension of Mr. Alexander's lay-in and a bottom bunk pass for three months. *Id.* at 25-26. She also completed an OPR form for an MRI of Mr. Alexander's right knee:

> **Exam Data/Objective Findings:**Pt is a 38 y/o WM whom reports popping right knee after colliding with another person during soccer and pt heard a pop and had instant pain and dropped to ground June 30, 2024. Pt states the only improvement is decrease in swelling. Initial Extension 100%, Flexion, pain past 90. Knot in muscle noted above right side patella. Pt reports tingling down to toes if he puts pressure on knee for too long. Right knee ultrasound complete suggesting thicken lateral collateral ligament complex suggesting sprain wihtout tear. Moderate joint effusion. Recommended MRI.
> Pt has been utilizing crutches and RICE protocol. Pain at bottom knee cap with flexion past 110, pain behind knee and right side at 85 degree extension.
> OPR MRI right knee

*Id.* at 27–28.

Mr. Alexander submitted an HCRF on September 8, requesting another extension of his medical lay-in and complaining that he had not yet had an MRI. *Id.* at 29. Nurse Willis responded two days later that the order for the MRI was pending. *Id.* On September 10, Mr. Alexander submitted another HCRF requesting a lay-in extension and complaining of pain. *Id.* at 30. On September 11, Mr. Alexander filed a grievance complaining that he had not received a response to "multiple HCRFs requesting to be seen to find out when my damaged

knee could be repaired/surgery/etc." and that he had to walk with crutches to the chow hall and commissary. Dkt. 68-2 at 1.

Mr. Alexander saw Nurse Dugan on September 14. Dkt. 68-1 at 31. She told him that NP Campbell had submitted the OPR for his MRI but was unsure when it would be completed. *Id.* Nurse Dugan informed NP Campbell that Mr. Alexander wanted an extension of his medical lay-in. *Id.* Mr. Alexander was given a Toradol injection for his pain. *Id.* at 31. On September 18, Nurse Dugan charted that Acetaminophen and Meloxicam had been ordered. *Id.* at 32. NP Campbell also ordered a medical lay-in and a bottom range/bottom bunk pass from September 18 through December 18. *Id.* at 33.

On October 3, a non-party grievance specialist relayed to Mr. Alexander, in response to his MRI request, that defendant HSA Sarah Bedwell said that the request had been submitted for an offsite MRI and was still pending. Dkt. 68-2 at 2. Dr. Manju Thothala reviewed the OPR. Dkt. 68-7 ¶ 5. Dr. Thothala explains that an MRI of the knee following trauma is generally warranted when there is documented ligamentous instability, symptoms are functionally limiting or progressive, and/or conservative management has failed. *Id.* ¶ 9. 30. Dr. Thothala noted that x-rays were negative for fracture and an ultrasound showed a thickened LCL that was consistent with a sprain but not a full-thickness tear. *Id.* ¶ 11. There was no documentation of grade 2 or 3 LCL instability on Mr. Alexander's chart. *Id.* ¶ 8. Mr. Alexander's records also showed that he had been receiving appropriate conservative care (ACE wrap, crutches, etc.). *Id.* ¶ 10. Physical therapy is the initial intervention typically recommended for LCL

sprains and partial meniscal tears. *Id.* ¶ 12. Therefore, Dr. Thothala denied the MRI request but issued an alternative treatment plan ("ATP") approving Mr. Alexander for physical therapy in addition to ongoing conservative measures. Dkt. 68-3. NP Campbell submitted an OPR for physical therapy that day. Dkt. 63-1 at 34-35.

Mr. Alexander began receiving physical therapy every other week from November 4 until February 24, 2025. Dkt. 68-1 at 39-46. On November 18, physical therapist Zane Hayden noted that Mr. Alexander had stated he had not been called over for a brace. His notes further state: "Plan F/U wk → Ortho Glass R Leg…." *Id.* at 39. He further noted that Mr. Alexander had requested the splint, which was applied with an Ace wrap. *Id.* at 40.

On January 8, 2025, the physical therapist noted that Mr. Alexander was doing better and that he advised Mr. Alexander to try walking without the splint. *Id.* at 43. That day, a non-party nurse noted that Mr. Alexander's caseworker asked about his medical idle status and that NP Campbell stated that Mr. Alexander had been given a cane and returned his crutches so that he could start to return to normal function. *Id.* at 47. She further noted that Mr. Alexander could go back to work on light duty status. *Id.*

On February 24, Mr. Hayden noted that Mr. Alexander was still having pain on the outside of his knee and agreed to discontinue physical therapy as no progress was made. *Id.* at 46. Mr. Hayden referred Mr. Alexander for a right knee injection for inflammation. *Id.* at 50. He noted that Mr. Alexander would return to physical therapy two months after the injection with the hope that a reduction

in pain and swelling would improve function. *Id.* at 46. Mr. Alexander submitted an HCRF on March 12 complaining that he was still in pain and that nothing was being done. *Id.* at 51. NP Campbell responded that "physical therapy recommended steroid injection, this is scheduled. We can follow up after if needed." *Id.*

NP Campbell saw Mr. Alexander on April 17. *Id.* at 53-55. She noted that he had been referred for a steroid injection, which was scheduled for the next day. *Id.* at 53. He stated that he had been using another inmate's diclofenac gel when he experienced "pain flares," with some relief. *Id.* He also reported improvement with the "knee sleeve" provided to him by physical therapy, but the sleeve had become unraveled in the laundry. *Id.* NP Campbell ordered a replacement knee sleeve, three months' worth of Meloxicam, and diclofenac gel. *Id.* at 55. She also advised Mr. Alexander to keep using the RICE method and that he would be receiving a corticosteroid injection the next day. *Id.* Dr. Byrd administered an injection of methylprednisolone acetate, a "long acting" corticosteroid, which works by reducing inflammation in the joint lining and can offer relief for four to eight weeks. *Id.* at 56; dkt. 68-4 ¶ 5. Mr. Alexander received a replacement knee sleeve on May 9. Dkt. 68-1 at 57.

Mr. Alexander next submitted an HCRF dated July 12, stating "my knee is messed up. I have not seen the nurses yet and I need my lay-in extended." Dkt. 41-1 at 56.[3] Mr. Alexander saw Nurse Dugan on August 8. Dkt. 68-1 at 63-65.

---

[3] This HCRF was stamped received on August 13. Dkt. 68-1 at 73. The defendants suggest that Mr. Alexander may have fabricated the July date on this HCRF, but the Court credits Mr. Alexander's July date at summary judgment.

She charted that Mr. Alexander arrived in a wheelchair and reported that his knee was re-injured during rec and could not bear full weight. *Id.* at 64. Nurse Dugan educated him on how to self-treat using the RICE method, provided ibuprofen, exchanged his cane for crutches, issued an Ace bandage wrap, and ordered a medical lay-in for five days. *Id.* at 65-68. On August 13, Nurse Dugan extended his medical lay-in for another week. *Id.* at 69. NP Campbell saw Mr. Alexander on August 19 and noted full range of motion, no obvious signs of pain during the exam, and ability to extend his knee. *Id.* at 71. She also noted "significant improvement with injection" and that she would order another x-ray and ultrasound to ensure there were no abnormalities before referring him back to physical therapy. *Id.* at 72.

On August 22, Mr. Alexander had a right-knee x-ray, which showed no fractures, dislocations, foreign bodies, or abnormalities. *Id.* at 74. Then, on September 24, an ultrasound showed "significant prepatellar edema." *Id.* at 75. On September 30, the Court issued a preliminary injunction ordering an MRI of his knee. Dkt. 46. NP Campbell submitted an OPR for the MRI the next day. Dkt. 68-1 at 76-77. The MRI, taken on October 16, showed a horizontal tear involving the body and posterior horn of the medial meniscus (indicating a partial-thickness tear); intact lateral meniscus and cruciate and collateral ligaments; mild chondrosis (cartilage breakdown) of the medial compartment with some superficial chondral fissuring; lateral and patellofemoral compartment chondral surfaces maintained; and soft joint effusion. *Id.* at 78. Dr. Byrd explains that "'horizontal tears' are nearly always partial-thickness, especially when there is

no mention of displacement, fragment separation, or a bucket-handle component." Dkt. 68-4 ¶ 20.[4] He further explains that these kinds of injuries are generally managed initially with physical therapy, activity modification, NSAIDs, and sometimes injections. *Id.* ¶ 22. Surgery is usually considered only if symptoms persist or there is mechanical locking. *Id.* ¶ 23.

On October 23, 2025, a non-party nurse practitioner completed an OPR for an appointment with an orthopedic surgeon. Dkt. 68-1 at 79-80. NP Campbell saw Mr. Alexander on November 4 and informed him of the OPR. *Id.* at 81-83. She noted that she had renewed Mr. Alexander's bottom bunk pass and given him new ACE wraps. *Id.* He had already been provided with a wheelchair after he reported issues with his crutches. *Id.* NP Campbell extended his wheelchair pass to expire on March 4, 2026. *Id.* at 84. Mr. Alexander had a consultation with an orthopedic surgeon on November 17, and that consultation states: "PLAN: Will be for right knee arthroscopy, debridement of meniscus, and possible chondroplasty of the associated areas as needed." Dkt. 77-1 at 89.

## IV.
## Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*,

[4] Mr. Alexander argues that Dr. Byrd and Dr. Thothala are not qualified to opine about the meaning of this tear or the proper treatment for it. He goes on to provide his own explanation of this condition, but does not demonstrate his qualifications on this matter. He also points out that Dr. Byrd lost his medical license in 2017. But his license was restored in 2020 and Mr. Alexander has not demonstrated a connection between this incident and Dr. Byrd's actions in this case.

314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021).

The defendants do not dispute that Mr. Alexander's knee injury constituted an objectively serious medical condition. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that the defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Alexander]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Mr. Alexander "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241.

The Seventh Circuit has held that deliberate indifference can occur when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

**A. NP Campbell and Dr. Thothala**

Mr. Alexander alleges that NP Campbell delayed seeing him for his knee injury, failed to provide him with a proper splint and pain medication, and failed to ensure he had an MRI. NP Campbell argues that she did not delay seeing him and that the initial conservative treatment she provided was appropriate.

Mr. Alexander first saw NP Campbell on July 10, ten days after his injury. *Id.* at 11-13. NP Campbell affirms that she does not schedule provider visits and therefore was not responsible for any alleged delay. Dkt. 68-5 ¶ 11. Mr. Alexander has designated no contrary evidence. So no reasonable jury could find that NP Campbell was deliberately indifferent based on any delay. *See Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) ("To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right."); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (explaining the appropriate division of labor in a prison).

When NP Campbell first saw Mr. Alexander, he already had an Ace wrap on his knee. Mr. Alexander challenges the effectiveness of the Ace wrap but has not designated evidence to allow a jury to conclude that this treatment departed so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it was not based on judgment at all. *Petties*, 836 F.3d at 729. NP Campbell advised him to continue treating his knee with the RICE method and using crutches. Dkt. 68-1 at 11-13. *Id.* at 12. She also ordered a two-month extension of his medical lay-in, an ultrasound for further assessment, and ibuprofen for his pain. *Id.* at 12, 14-15. She extended his lay-in and a bottom bunk passes again on August 19. *Id.* at 25-26.

Also on August 19, NP Campbell completed an OPR form for an MRI of Mr. Alexander's right knee. *Id.* at 27-28. Mr. Alexander argues that NP Campbell was deliberately indifferent when she wrote in the OPR that the ultrasound showed a sprain "without tear" instead of a sprain "without full-thickness tear." But the OPR includes ample detail regarding Mr. Alexander's condition and injury, including that Mr. Alexander's injury had only minimal improvement, that he had a knot in his muscle, and that he reported tingling down to his toes. *Id.* at 28. Given NP Campell's otherwise thorough OPR, no reasonable jury could conclude that she was deliberately indifferent when she used the phrase "without tear" rather than "without full-thickness tear." *See Stockton v. Milwaukee County*, 44 F.4th 605, 616 (7th Cir. 2022) (affirming summary judgment after a nurse practitioner's misdiagnosis because "[m]istakes in medical judgment, even negligence, are insufficient to support deliberate indifference").

Dr. Thothala reviewed NP Campbell's OPR for an MRI and denied it in October 2024 in favor of physical therapy. *See* dkt. 68-1 at 36; dkt. 77 at 18. Dr. Thothala's uncontested designated evidence is that an MRI is generally appropriate when there is documented instability, the symptoms are limiting, and conservative management has failed. Dkt. 68-7 ¶ 9. Because Mr. Alexander's ultrasound showed a thickened LCL, consistent with a sprain, but not a full-thickness tear, physical therapy was a reasonable initial recommended intervention, in addition to other conservative measures. *Id.* ¶ 12. In other words, Dr. Thothala has designated evidence that she exercised medical judgment when she denied NP Campbell's request for an MRI and recommended physical therapy instead. *See Stockton*, 44 F.4th at 616 (A medical professional's "decision to forego diagnostic tests is a classic example of a matter for medical judgment entitled to deference."). Although an outside specialist recommended surgery after Mr. Alexander's second injury, he has not shown that Dr. Thothala did not exercise professional judgment at the time she reviewed the request for an MRI.[5] Dr. Thothala is therefore entitled to summary judgment.

After submitting the OPR request, NP Campbell provided Mr. Alexander with pain medication when she was aware of his complaints. And, in September 2024, when Mr. Alexander requested an extension of his medical lay-in and said that the pain medication he had been purchasing from commissary had not been helping his pain, he was given a Toradol injection, and Acetaminophen and Meloxicam were ordered. *Id.* at 31-32. In addition, NP Campbell ordered a

[5] Mr. Alexander raises no other theory of Dr. Thothala's liability. *See* dkt. 77 at 25–27.

medical lay-in and a bottom range/bottom bunk pass from September 18 through December 18. *Id.* at 33. Although Mr. Alexander complains that the medication was not effective, he does not designate evidence allowing a reasonable jury to conclude that, when NP Campbell was made aware of Mr. Alexander's pain, she persisted in ineffective treatment. *See Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (affirming summary judgment on deliberate indifference because "the Eighth Amendment does not . . . impose the unrealistic requirement that doctors keep patients completely pain-free" and the medical professionals "repeatedly altered Arce's pain medication in response to his complaints").

After Mr. Alexander re-injured his knee on August 8, his crutches were returned, he received new orders for a medical lay-in, medication, further testing, and he was referred back to physical therapy. *Id.* at 70-72.

In sum, the designated evidence reflects that when NP Campbell saw Mr. Alexander, she evaluated his complaints and provided treatment and pain medication. *See Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018) (affirming summary judgment because the totality of the medical care showed repeated efforts to diagnose and treat medical concerns). When he continued to complain, she requested additional testing and treatment. There is no designated evidence allowing a reasonable jury to find that NP Campbell persisted in treatment that wasn't working, ignored instructions from a specialist, chose an easier or less efficacious treatment, or otherwise disregarded his complaints. No reasonable jury could conclude that NP

Campbell was deliberately indifferent to his condition. *See Arce*, 75 F.4th at 679–81.

NP Campbell and Dr. Thothala are entitled to summary judgment.

**B. Dr. Byrd**

Mr. Alexander alleges that Dr. Byrd was one of the individuals who denied NP Campbell's request for an MRI. But Dr. Byrd affirms that he is not part of the Utilization Management Team and did not have a role in reviewing or denying the MRI request. Dkt. 68-4 ¶ 16-17. Mr. Alexander has not designated contrary evidence. *See* dkt. 77 at 36–38. Next, Dr. Byrd argues that he had no role in Mr. Alexander's care other than providing a steroid injection on April 15, 2025. Mr. Alexander suggests that Dr. Byrd should have known that Mr. Alexander's injury required different treatment at this time, but he designates no evidence allowing a reasonable jury to conclude that Dr. Byrd was responsible for doing so, or that during this one interaction with Mr. Alexander he took any action that was not based on professional medical judgment at all. *See Stockton*, 44 F.4th at 616. Dr. Byrd is therefore entitled to summary judgment.

**C. HSA Bedwell**

Ms. Bedwell argues that she was not responsible for Mr. Alexander's care. The only involvement Ms. Bedwell had in his treatment was her response to a grievance Mr. Alexander filed about his care. She responded that the request had been submitted for an offsite MRI and was still pending. Dkt. 68-2 at 2. Because there is no designated evidence that Ms. Bedwell had any other knowledge of or role in his care, she is entitled to summary judgment. *See Colbert v. City of*

*Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation.").

**D. Nurse Willis**

Mr. Alexander alleges that Nurse Willis was deliberately indifferent by delaying treatment and failing to provide him with a proper splint. Mr. Alexander saw Nurse Willis on July 7, about a week after his initial injury. Dkt. 68-1 at 10. She reviewed the x-ray results with Mr. Alexander, advised him to rest and to wear the Ace wrap correctly, and referred him to the nurse practitioner. *Id.* Then, on July 16, when Mr. Alexander submitted an HCRF stating that his knee hurts "extremely bad," she responded that Mr. Alexander had been scheduled for a provider visit. *Id.* When Mr. Alexander submitted an HCRF on September 8, requesting another extension of his medical lay-in and complaining that he had not yet had an MRI, Nurse Willis responded two days later that the order for the MRI was pending. *Id.*

The designated evidence therefore reflects that Nurse Willis reviewed Mr. Alexander's complaints and referred him for treatment. Mr. Alexander has not designated evidence to allow a jury to conclude that Nurse Willis unnecessarily delayed his treatment. Further, to the extent that he contends that Nurse Willis failed to provide him with a "proper" knee brace, he has not designated evidence that would allow a jury to conclude that the application of the Ace wrap was so far outside of professional judgment as to allow a conclusion that Nurse Willis's advice regarding the brace was the result of deliberate indifference. *See Stockton*, 44 F.4th at 616. Nurse Willis is therefore entitled to summary judgment.

## V. Conclusion

Mr. Alexander's motion for sanctions, dkt. [94], and motion to stay findings for summary judgment and to appoint an independent medical doctor, dkt. [100], are **denied**. His motion for an extension of time to file a response to the motion for summary judgment, dkt. [101], is **granted** to the extent that his surreply, dkt. 103, has been considered.

The defendants' motion for summary judgment, dkt. [67], is **granted**. Judgment consistent with this Order shall now issue.

**SO ORDERED.**

Date: 9/30/2026

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

CHARLES ALEXANDER
290923
WABASH VALLEY - CF
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

All electronically registered counsel